Edward THOMPSON, Jr., Appellant,

v.

KENTUCKY UNEMPLOYMENT IN-SURANCE COMMISSION and Pack-aging Unlimited, Inc., Appellees.

No. 2001–CA–000422–MR.

Court of Appeals of Kentucky.

April 26, 2002.

Rehearing Denied Aug. 23, 2002.

Case Ordered Published by Court of Appeals Aug. 23, 2002.

Edward Thompson, Jr., Covington, pro se.

Jeffrey S. Schafer, Louisville, Kentucky, for appellee, Packaging Unlimited.

Randall K. Justice, Assistant General Counsel, Frankfort, Kentucky, for appellee, Kentucky Unemployment Insurance Commission.

Before BUCKINGHAM, DYCHE and JOHNSON, Judges.

## OPINION

JOHNSON, Judge.

Edward Thompson, Jr., *pro se*, has appealed from a judgment of the Kenton Circuit Court entered on January 29, 2001, which affirmed a decision of the Kentucky Unemployment Insurance Commission (KUIC) which had denied Thompson unemployment insurance benefits. Having concluded that KUIC's factual findings were supported by substantial evidence and that it applied the correct law to the facts as found, we affirm.

Thompson was initially employed at Packaging Unlimited in July 1994, as an assistant die cutter operator. Approximately two and a half years later, he was promoted to an operator's position. He worked the second shift, 3:30 p.m. to 2:00 a.m., four days a week. In January 1998, Packaging Unlimited ceased operations of the second shift and Thompson was reassigned to the first shift as an assistant operator with a decrease in his hourly rate of pay. In June 1998, the second shift was reinstated but Thompson remained on the first shift. On August 24, 1998, Thompson left work unannounced, upset about the circumstances surrounding his job. However, a short time later, he contacted Charles Richards, the plant manager, and apologized. The company issued Thompson a reprimand and suspended him from work for four days. Upon his return, Thompson was reassigned to the second shift as an operator at a rate of pay that was higher than his pay prior to his transfer to the first shift. Two operators usually worked on the first shift, while only one operator was employed to work on the second shift.

On the night of August 24, 1999, Thompson gave the foreman, his immediate supervisor, a written notice of resignation "because my job is stressful working under Charles Richards['] discriminated actions." [1] Thompson told the foreman that consistent with company policy the resignation was intended to become effective after two weeks. After Richards received Thompson's resignation letter the next day, he notified Thompson that his resignation was accepted but that his employment was being terminated immediately as of August 25, 1999.

On August 26, 1999, Thompson filed an initial claim for unemployment benefits. Following a preliminary investigation, the Division of Unemployment Insurance denied the claim under KRS[2] 341.370(1)(c) based on a finding that Thompson had voluntarily quit work without good cause. Thompson appealed the decision to a referee[3], who held a hearing on December 8, 1999, at which both Thompson and Richards testified. In a written opinion, the referee modified the initial determination. The referee found that Thompson was entitled to benefits for the two-week period from August 22 to September 4, 1999, which coincided with his two-week advanced notice period, but denied Thompson any benefits after that period.[4] The referee further found that the company's termination of Thompson prior to the effective date intended in the two-week ad-

---

1. Thompson is African–American and Richards is Caucasian.

2. Kentucky Revised Statutes.

3. KRS 341.420(2).

4. *See* KRS 341.430(1).

**624**

vanced notice was not based on reasons constituting "discharge for misconduct" under KRS 341.370(6), but that Thompson had not established that his resignation was because of racial discrimination or other improper conduct by the employer. On April 11, 2000, a three-member panel of the KUIC issued an order which affirmed the referee on substantially the same grounds and rationale as expressed by the referee. Thompson appealed to the circuit court,[5] which affirmed the KUIC's decision. This appeal followed.

■ Upon review of an administrative agency's adjudicatory decision, an appeal court's authority is somewhat limited.[6] The judicial standard of review of an unemployment benefit decision is whether the KUIC's findings of fact were supported by substantial evidence and whether the agency correctly applied the law to the facts.[7] Substantial evidence is defined as evidence, taken alone or in light of all the evidence, that has sufficient probative value to induce conviction in the minds of reasonable people.[8] If there is substantial evidence to support the agency's findings, a court must defer to that finding even though there is evidence to the contrary.[9] A court may not substitute its opinion as to the credibility of the witnesses, the weight given the evidence, or the inferences to be drawn from the evidence.[10] A court's function in administrative matters is one of review, not reinterpretation.[11]

Thompson contends that the KUIC erred in finding that he was not entitled to receive unemployment insurance benefits subsequent to September 5, 1999. Before the referee, Thompson argued that racially discriminatory conditions forced him to quit his job. Under KRS 314.370(1)(c):

(1) A worker shall be disqualified from receiving benefits for the duration of any period of unemployment with respect to which:

. . . .

(c) He has left his most recent suitable work ... voluntarily without good cause attributable to the employment.

■ It is well-established that "good cause" for purposes of determining whether an employee voluntarily left suitable work "exists only when the worker is faced with circumstances so compelling as to

**5.** KRS 341.450.

**6.** *See American Beauty Homes Corp. v. Louisville & Jefferson County Planning & Zoning Commission,* Ky., 379 S.W.2d 450 (1964)(stating judicial review involves whether an administrative agency's decision is arbitrary).

**7.** *Burch v. Taylor Drug Store, Inc.,* Ky.App., 965 S.W.2d 830, 834–35 (1998)(citing *Southern Bell Telephone & Telegraph Co. v. Kentucky Unemployment Insurance Commission,* Ky., 437 S.W.2d 775, 778 (1969)); *Kentucky Unemployment Insurance Commission v. Stirrat,* Ky.App., 688 S.W.2d 750, 751–52 (1984); *Tackett v. Kentucky Unemployment Insurance Commission,* Ky.App., 630 S.W.2d 76, 78 (1982).

**8.** *See Owens–Corning Fiberglas Corp. v. Golightly,* Ky., 976 S.W.2d 409, 414 (1998); *Piper v. Singer Co.,* Ky.App., 663 S.W.2d 761, 763 (1984); and *Barren River Mental Health–Mental Retardation Board, Inc. v. Bailey,* Ky.App., 783 S.W.2d 886, 888 (1990)(quoting *Kentucky State Racing Commission v. Fuller,* Ky., 481 S.W.2d 298, 308 (1972)).

**9.** *See generally Whittaker v. Rowland,* Ky., 998 S.W.2d 479, 481 (1999); and *Kentucky Commission on Human Rights v. Fraser,* Ky., 625 S.W.2d 852, 855 (1981).

**10.** *See Burch, supra* at 834; *Energy Regulatory Commission v. Kentucky Power Co.,* Ky.App., 605 S.W.2d 46, 50 (1980); *Railroad Commission v. Chesapeake & Ohio Railway Co.,* Ky., 490 S.W.2d 763, 766 (1973).

**11.** *See Kentucky Unemployment Insurance Commission v. King,* Ky.App., 657 S.W.2d 250, 251 (1983); *Piper, supra* at 763.

leave no reasonable alternative but loss of employment."[12] In addition, "voluntary" connotes a decision to quit that is "freely given" and "proceeding from one's own choice or full consent."[13] A claimant bears the burden of showing that he did not leave his job voluntarily without good cause attributable to his employment.[14]

■ At the administrative proceeding, Thompson presented evidence of three incidents in support of his claim of discriminatory conditions that justified his leaving his job. Although there are no Kentucky cases dealing with this issue, certainly illegal acts of harassment or racial discrimination can constitute good cause to voluntarily terminate one's employment[15] when it rises to a level "so compelling as to leave no reasonable alternative." First, Thompson stated that Richards denied his request for a full-time assistant, while providing one to the white machine operators. He alleged that Richards rejected his suggestion that either of two named individuals be assigned as his assistant. Thompson indicated that he believed one of the individuals was not appointed as his assistant because that individual also was African-American. Thompson said that he was occasionally provided assistance by unqualified persons and the lack of full-time assistance by a qualified assistant affected his ability to derive additional income from the company's incentive production bonuses.

Richards testified that the first/day shift received priority in meeting production quotas and the second/night shift served in part to complete projects begun on the earlier shift. Richards said that the African-American individual recommended by Thompson as his assistant was not suitable as a full-time assistant because he was working through a temporary employment agency under a renewable short-term contract and the other person had a poor attendance record and was unreliable. Richards also stated that two operators worked on the first shift and served as assistant operators when only one machine was in use; whereas, only one operator worked on the second shift and an assistant was not always available or necessary.

Second, Thompson alleged that Richards distributed job assignments inequitably and the white operators were given more favorable treatment by assigning them projects that could be completed more quickly, thereby generating more production bonuses. Richards testified that the projects were assigned based on time constraints from the customer orders

12. See Kentucky Unemployment Insurance Commission v. Murphy, Ky., 539 S.W.2d 293, 294 (1976); Barren River Mental Health–Mental Retardation Board, supra; Raines v. Kentucky Unemployment Insurance Commission, Ky.App., 669 S.W.2d 928, 930 (1983); and H & S Hardware v. Cecil, Ky.App., 655 S.W.2d 38, 40 (1983).

13. Kentucky Unemployment Insurance Commission v. Young, Ky., 389 S.W.2d 451, 453 (1965); Nichols v. Kentucky Unemployment Insurance Commission, Ky.App., 677 S.W.2d 317, 321 (1984).

14. Kentucky Unemployment Insurance Commission v. Day, Ky., 451 S.W.2d 656, 657 (1970); Broadway & Fourth Avenue Realty Co. v. Allen, Ky., 365 S.W.2d 302, 304 (1962).

15. See, e.g., Brown v. Unemployment Compensation Board of Review, 780 A.2d 885 (Pa. Cmwlth. 2001); Taylor v. Unemployment Compensation Board of Review, 474 Pa. 351, 378 A.2d 829 (1977)(race); Marz v. Department of Employment Services, 256 N.W.2d 287 (Minn.1977); Biles v. Ohio Bureau of Employment Services, 107 Ohio App.3d 114, 667 N.E.2d 1244 (1995)(sex discrimination); and Umbarger v. Virginia Employment Commission, 12 Va.App. 431, 404 S.E.2d 380 (1991)(sex discrimination).

and the type of machine [16] used to produce a particular order. While Thompson could operate a Flexo machine, he was more competent using the McKinley machine. Thompson testified that he complained to his immediate supervisor about the assignments and the need for a full-time assistant, but he admitted that he did not exhaust the company's grievance procedure.[17]

Third, Thompson testified that he occasionally saw two ropes at the work site in the maintenance area and the break room that were tied in a manner resembling a hangman's noose. He viewed these ropes as signs of racial intimidation. Richards testified that the rope in the maintenance area was used to move heavy machinery. He stated that he did see such a rope in the break room on one occasion and immediately had it removed. Thompson testified that he never raised a complaint about the ropes with supervisory personnel in the company.

The KUIC found that the evidence did not show that the employer practiced racial discrimination or that Thompson was singled out for disparate treatment. The KUIC noted that the employer offered evidence that the work assignments were related to legitimate business factors. As for the ropes, the KUIC acknowledged that they could be perceived as racially motivated, but the use of one of the ropes to move machinery was justified and the quick removal of the other persuaded it that the evidence did not establish that the

company knowingly promoted or tolerated racial harassment.

■ We agree with the KUIC that Thompson failed to satisfy his burden of proving that he had good cause attributable to his employment to justify quitting his position. As the fact-finder, the KUIC has the exclusive authority to weigh the evidence and the credibility of the witnesses. Although Thompson raised some complaints with his immediate supervisor, the KUIC noted that Thompson failed to exhaust the internal company grievance procedure concerning any of his complaints. Consequently, Thompson did not show that he was faced with circumstances so compelling that he had no reasonable alternative but to leave his employment. We hold that the KUIC's factual findings were supported by substantial evidence and that it correctly applied the law to the facts as found.

■ In his appellate brief, Thompson argues that Packaging Unlimited's immediate termination of his employment prior to the effective date of his resignation constituted a discharge that entitles him to unemployment benefits from that date despite his resignation. We believe the KUIC properly separated the two issues.[18] Thompson submitted his voluntary resignation before Richards terminated him, so his unemployed status following the two-week notice period was not due to the

---

**16.** Packaging Unlimited used two types of rotary die cutter machines, a McKinley and a Flexo. The McKinley was the newer machine of the two but it did not have the capability to hold, stack, and glue as did the Flexo.

**17.** The company grievance procedure provided for complaints first to the immediate supervisor, then to the plant manager or human resources manager, and finally to the company president.

**18.** The KUIC cited *Barren River Mental Health–Mental Retardation Board, supra,* which involved a situation where the court held a claimant was not entitled to benefits for a two-week period that she did not work after voluntarily quitting following being notified that she would be discharged effective two weeks later. The KUIC noted this was the reverse of Thompson's situation.

company's action. Thompson would have left his job after September 5th, regardless of his immediate termination by Richards. The referee correctly analyzed Thompson's unemployed status during the two-week notice period as a discharge initiated by the company, and the subsequent period as a quitting initiated by Thompson.

For the foregoing reasons, the judgment of the Kenton Circuit Court affirming the order of the Kentucky Unemployment Insurance Commission is affirmed.

ALL CONCUR.