**KENTUCKY UNEMPLOYMENT INSURANCE COMMISSION, et al., Appellant,**

v.

**Diana CECIL, Appellee.**

No. 2010–SC–000349–DG.

Supreme Court of Kentucky.

Oct. 25, 2012.

———

James Chesnut Maxson, Education and Workforce Development Cabinet Office of Legal Legislative, Frankfort, KY, Donna King Perry, Dinsmore, Shohl LLP, Louisville, KY, Loren Teller Prizant, St. Louisville, KY, Counsel for Appellant.

Callie Elizabeth Walton, Helmers, Demuth & Walton, PLC, Louisville, KY, Counsel for Appellee.

Opinion of the court by Justice SCHRODER.

## INTRODUCTION

This Court granted discretionary review of a decision of the Court of Appeals which reversed an opinion and order of the Jefferson Circuit Court which affirmed an order of the Kentucky Unemployment Insurance Commission, in which the Commission concluded that Appellee Diana Cecil was terminated for misconduct and therefore did not qualify for unemployment benefits per KRS 341.370.

## BACKGROUND

Diana Cecil began working for Co–Appellant Louisville Water Company (hereinafter "LWC") as a right-of-way associate on October 29, 2001. Cecil was responsible for obtaining easements from landowners for LWC. In accepting this position, she agreed to the terms of employment as set out in LWC's Employee Handbook and Code of Conduct. Employees are provided with a copy of each upon accepting employment. The Code of Conduct identifies general work standards, which include "[f]ollow[ing] work schedules, assignments, directions and instructions," and attendance conduct standards which include "[m]aintaining an acceptable attendance and punctuality record as a condition of employment, including reporting promptly to the assigned workstation at the assigned start time ... and following the Company's Tardiness standard." Under LWC's tardiness policy, an employee is considered late if the employee arrives at his or her work station ten minutes after the scheduled start time or later. An employee is considered to have violated the tardiness standard (and assessed a Code of Conduct violation) if the employee is tardy three or more times within a revolving ninety-day period.

LWC has a progressive disciplinary system for violations of the Code of Conduct, ranging from counseling up to termination. The disciplinary system is outlined in the employee handbook. Relevant to the present case, under this system, if an employee commits three violations of the Code of Conduct within any rotating 24 month period, the employee is placed on a one-day paid "Decision–Making Leave" after which the employee is given a choice-to resign or to accept a final chance to keep his or her job by signing a "last chance agreement" (referred to in the employee handbook as a "Post–Decisional Leave Statement") wherein the employee admits the violations, commits to improvement, and acknowledges that any more violations may result in immediate termination.

Cecil was assessed a Code of Conduct violation on July 15, 2004, for violating the tardiness standard, a second Code of Conduct violation the next day, July 16, 2004, for inappropriate behavior in a meeting to address her tardiness and leaving work early the day before, a verbal reprimand for tardiness on September 21, 2005, and a third Code of Conduct violation on October 7, 2005, for violating the tardiness standard. Having committed three Code of Conduct violations within a 24 month peri-

od, Cecil was, per LWC's disciplinary system, given the choice to resign or to keep her job by signing a "last chance agreement," wherein she would acknowledge that her repeated tardiness violated LWC's Code of Conduct, commit to remedy such in the future, and acknowledge that any future violations would result in immediate termination.[1] Cecil refused to sign, and LWC terminated her employment.

Cecil subsequently filed a claim for unemployment insurance benefits, which was denied in an initial determination on December 8, 2005, on grounds (pursuant to KRS 341.370) that "[t]he evidence of record establishes repeated occurrences of tardiness that were unnecessary or improperly reported ... [t]herefore, the discharge was for work related misconduct." Cecil appealed the denial of her claim to a referee of the Division of Unemployment Insurance. The referee held hearings on January 2, 2007, and February 28, 2007.[2] On March 5, 2007, the referee issued a decision which reversed the initial determination (based upon the referee's interpretation of a prior Kentucky Unemployment Insurance Commission decision, # 61582).

LWC appealed the March 5, 2007, referee decision to the Kentucky Unemployment Insurance Commission (hereinafter the "Commission"). On May 25, 2007, the Commission issued an Order reversing the March 5, 2007, referee decision, concluding that Cecil was not qualified to receive unemployment insurance benefits because she was fired for misconduct. Cecil appealed the Commission's order to the Jefferson Circuit Court pursuant to KRS 341.450. On November 18, 2008, the Jefferson Circuit Court entered an order affirming the Commission. Cecil appealed the Jefferson Circuit Court's decision to the Court of Appeals. The Court of Appeals reversed the Jefferson Circuit Court (and the Commission). We granted discretionary review and reverse the Court of Appeals.

## COMMISSION'S FINDINGS OF FACT

The facts as found by the Commission are, in pertinent part, as follows:

[Diana Cecil] worked as a right-of-way associate for [Louisville Water Company] from October 29, 2001, until November 2, 2005.

[Cecil's] eight-hour work day originally started at 8:00 a.m. Because [Cecil] was

1. The "last chance agreement," titled "Post Decision Making Leave Statement" stated:

I, Diana Cecil, acknowledge that my act of repeated tardiness to my workstation violates the Company's Code of Conduct Attendance Standard, Class 1.28.
I do desire to stay employed with the Louisville Water Company and will re-affirm my commitment by signing the attached Personal Quality Improvement Commitment form.
In the future, I agree to arrive at my workstation by the start time assigned by my process owner, currently 9:00 a.m. I understand repeated incidents of tardiness will result in my immediate termination.
Finally, I understand any additional Code of Conduct violation, of any kind, before July 15, 2006 (within 24 months of previous discipline) may also result in immediate termination.

2. The case had previously been heard by a referee who affirmed the initial determination. However, when Cecil appealed that referee decision to the Kentucky Unemployment Insurance Commission, it was discovered that the tapes from that referee hearing were inaudible, rendering it a nullity. Therefore, the Commission remanded the case for a new referee hearing. The initial referee decision denied Cecil benefits on the basis that she had "voluntarily quit without good cause." The parties agree, however, that Cecil did not voluntarily resign. *See* Appellee's brief, Appendix E, Claimant's/Appellee's Statement on Appeal from March 5, 2007 referee decision, footnote 1.

having. difficulty getting to work on time, the employer gave her, as well as other employees, the option of moving her start time to anytime between 7:30 a.m. and 9:00 a.m. [Cecil] chose the 9:00 a.m. to 6:00 p.m. shift. This occurred around February 2004. She was told that she was expected to be at her desk, or "workstation," by 9:00 a.m. each day. [Cecil] agreed that she would report on time.

On April 15, 2004, [Cecil] was counseled when she continued to be tardy. She was told that she was in violation of the code of conduct requiring punctuality. Under the code of conduct, employees are expected to maintain an acceptable attendance and punctuality record as a condition of employment, including. reporting promptly to the assigned work station at the assigned start time, and following the company's tardiness standard. This standard calls for a review of an employee's attendance record when the employee has three (3) or more incidents of tardiness within a revolving ninety (90) day period. Tardiness is defined as ten (10) minutes beyond the assigned start time.

In May 2004, [Cecil] continued to be late in violation of the attendance code of conduct. [Cecil] called on four (4) occasions to report tardiness and was late an additional two (2) times without calling. In June 2004, [Cecil] called in tardy on three (3) occasions. She was late an additional eight (8) times without reporting her tardiness. She was late again on July 1,2004.

On July 2, 2004, [Cecil] was counseled again regarding her tardiness during a meeting about another issue.

After being tardy four (4) times in July, 2004, on July 15, 2004, [Cecil] was assessed with a Class 1.28 Code of Conduct violation, which addresses attendance and punctuality. This violation assessed against [Cecil] was supposed to stand for twenty-four (24) months.

On September 21, 2005, [Cecil] was' given a performance review, during which she was told that she had been observed consistently coming in to work ten (10) to fifteen (15) minutes late, and that she needed to be at work on time each day. [Cecil] responded by saying "point taken." On that same day, the employer began to review [Cecil's] time records. [Cecil] arrived between five (5) minutes and twenty (20) minutes late on twelve (12) consecutive work days through October 7, 2005 (on October 6, 2005, [Cecil] was away from the office for a diversity seminar). Of these twelve (12) days late, seven of these days she was ten (10) or more minutes late. The tardy records from [Cecil's] supervisor were backed up by the records in the parking garage that registers the time the employee swipes their I.D. cards. The walk from the parking garage to [Cecil's] desk (her "assigned work station") was approximately two (2) minutes, and this time was not included in the employer's assessment of [Cecil's] tardiness for the days between September 21, 2005 and October 7, 2005.

. . .

One of these incidents of tardiness, Monday, September 26, 2005, [Cecil] was nineteen (19) minutes late due to two (2) [ ] traffic accidents. The record is lacking evidence as to the reasons for each of the other instances of tardiness in September and October of 2005.

On October 7, 2005, after she was twenty (20) minutes late that day, [Cecil] was assessed her second Class 1.28 Code of Conduct violation within twenty four (24) months. She was told that, despite previous counseling and warnings, she

had repeatedly reported to work tardy. In this assessment, [Cecil] was told that she was suspended for tardiness. She was also given a "Post Decision Making Statement" and a "Personal Quality Improvement Statement." The statements were warnings wherein [Cecil] was to admit to being in violation of company policy, stating that she was committed to improve, and acknowledging that any future violations would lead to discipline up to and including termination. [Cecil] was suspended for one day, October 10, 2005, and was to sign the statements and bring them back to work with her on October 11, 2005. Instead, she took an approved medical leave on October 11, 2005, through November 1, 2005, and returned with these statements, unsigned, on November 2, 2005.

When she returned on November 2, 2005, [Cecil] stated that she did not agree she had been tardy for all the incidents reported. She agreed that she had been tardy a few times but for the majority of the incidents of tardiness charged against her, [Cecil] denied being late. She felt that the system recording her time in the parking garage was in error and that she actually was at her work station by 9:00 a.m. [Cecil] refused to sign the statements as they were written. She informed her employer that she could not sign the statements because she believed to be false that portion of the "Post Decision Making Leave Statement" that states "I, Diana Cecil, acknowledge that my act of repeated tardiness to my workstation violates the Company Code of Conduct Attendance Standard, Class 1.28." [Cecil] wanted to modify that statement or provide a written denial of chronic tardiness somewhere on the page. The employer informed [Cecil] that the state-

ments stood as written, that neither statement would be modified, and that [Cecil] would not be allowed to make any written comments on the statements. Furthermore, if [Cecil] did not sign the documents, she would be terminated.

[Cecil] refused to sign the statements and was terminated effective November 2, 2006 [sic] [3]

Despite [Cecil's] tardiness record, she would have been retained as an employee of the employer, had she signed the statements.

### APPLICABLE LAW

KRS 341.370 provides, in relevant part:

(1) A worker shall be disqualified from receiving benefits for the duration of any period of unemployment with respect to which:

. . .

(b) He has been discharged for misconduct or dishonesty connected with his most recent work, or from any work which occurred after the first day of the worker's base period and which last preceded his most recent work, but legitimate activity in connection with labor organizations or failure to join a company union shall not be construed as misconduct; [ ]

. . .

(6) "Discharge for misconduct" as used in this section shall include but not be limited to, separation initiated by an employer for falsification of an employment application to obtain employment through subterfuge; knowing violation of a reasonable and uniformly enforced rule of an employer; **unsatisfactory attendance if the worker cannot show good cause for absences or tardiness;**

---

3. November 2, 2005.

damaging the employer's property through gross negligence; **refusing to obey reasonable instructions;** reporting to work under the influence of alcohol or drugs or consuming alcohol or drugs on employer's premises during working hours; conduct endangering safety of self or co-workers; and incarceration in jail following conviction of a misdemeanor or felony by a court of competent jurisdiction, which results in missing at least five (5) days work.

(Emphasis added.)

The Commission found that:

The allegations that claimant was repeatedly tardy to her workstation were supported by the evidence. The employer proved by a preponderance of the evidence that claimant was warned several times for being chronically late, and that she was late every day but one (1) on the twelve (12) consecutive working days leading up to the date of discharge (including being ten (10) minutes or more late on seven (7) occasions within that three (3) week period).

If this were an unsatisfactory attendance case, claimant would be required to prove that a majority of these instances of tardiness were for good cause. (See the "unsatisfactory attendance" example set forth in KRS 341.370(6)). The evidence showed only one (1) tardy was for good cause during this period in late September and early October 2005.

But instead of unsatisfactory attendance, this case involves analysis of the "refusing to obey reasonable instructions" example of misconduct in KRS 341.370(6). By the employer's own admission, the claimant would not have been discharged had she not refused to sign the written warnings. The question is whether it was a "reasonable instruction" to insist that claimant sign these warnings, as written, or lose her job.

This issue was addressed by the Commission in precedent decision # 61582, where it was held the claimant's refusal to sign a warning admitting guilt to certain allegations was a reasonable refusal and not misconduct, where the warning was not formatted in such a way that by signing it the claimant would simply have been acknowledging receipt, and where the claimant was not afforded space to provide a written response to the allegations. However, as *the threshold requirement* for finding the refusal to sign was not misconduct, the precedent held that the claimant in that case was instructed to admit culpability to **allegations that were *not* supported by the evidence of record.**

By contrast, in the case at hand the **allegations** against claimant, namely chronic tardiness, are clearly **supported by the evidence of record.** Upon signing the warning against her, the claimant would have acknowledged that her act of repeated tardiness to her workstation violated the company code of conduct. That code defined a violation as three (3) instances of tardiness (ten (10) or more minutes late) within three (3) months, and claimant well exceeded this number in just a three (3) week period. Since the evidence in the record supports a violation of the attendance and punctuality provisions in the code of conduct, it was a reasonable instruction to demand that claimant sign the warnings admitting to same. The claimant did not act reasonably in refusing to sign. The claimant "refus[ed] to obey reasonable instructions", according to the statutory example of misconduct, and is therefore disqualified from receiving unemployment benefits.

The Commission further notes that even if the written statements that claimant was instructed to sign are determined to

be part of a "last chance agreement" for the employee, rather than warnings, the result is the same. If the conduct alleged in the "last chance agreement" is supported by the record, then the refusal to sign that agreement, as written and without qualification, would be a refusal to obey reasonable instructions and therefore misconduct by statute.

(Emphasis original.)

Having concluded that Cecil was discharged from the employment for reasons of misconduct connected with the work, the Commission held that she was disqualified from receiving benefits from October 30, 2005, through the duration of the unemployment. The Jefferson Circuit Court affirmed. The Court of Appeals reversed, stating:

> [W]e do not dispute, or disagree with the findings of fact made by the Commission indicating that Cecil was, in fact, guilty of being tardy on numerous occasions ... Unfortunately for the employer in this instance, we cannot agree with the Commission that the Water Company's request for Cecil to sign an agreement [the Post Decision Making Leave Statement] admitting to behavior which she disputed was reasonable.
>
> ...
>
> Indeed, while it would have been acceptable even to terminate Cecil on the basis of the tardies, we cannot find that it was reasonable to force Cecil to choose between being terminated or signing a statement containing admissions she believed to be false. Having so found, we are compelled to reverse.

In so finding, we are compelled to agree with Cecil's [ ] argument that the Commission erred in applying the law to the facts in this instance. As Cecil correctly notes, the test for determining misconduct is whether the employee's actions evidenced a willful and wanton disregard

of the employer's interests. *See Burch v. Taylor Drug Store Inc., et al.,* 965 S.W.2d 830, 835 (Ky.App.1998): Further, in order to constitute misconduct under a statute, there must be bad faith or an inference of culpability in the form of willful or wanton conduct. *Id.* Indeed, as recently as last year, this Court held that such a showing continued to be required. *See, e.g., Kentucky Unemployment Insurance Commission v. Duro Bag Manufacturing Co.,* 250 S.W.3d 351 (Ky.App.2008).

Cecil asserts that she exhibited no such behavior, and that at most, she acted in good faith in stating that she wished to remain employed and in denying the tardiness issue. She argues that the Water Company failed in its responsibility to show that her action was willful or wanton. For the reasons previously set forth herein, we agree, and are compelled to reverse accordingly.

This Court granted discretionary review.

## STANDARD OF REVIEW

█ Judicial review of a decision of the Kentucky Unemployment Insurance Commission is governed by the general rule applicable to administrative actions. "If the findings of fact are supported by substantial evidence of probative value, then they must be accepted as binding and it must then be determined whether or not the administrative agency has applied the correct rule of law to the facts so found." *Southern Bell Tel. & Tel. Co. v. Kentucky Unemployment Ins. Comm'n,* 437 S.W.2d 775, 778 (Ky.1969) (citing *Brown Hotel Co. v. Edwards,* 365 S.W.2d 299 (Ky.1962)). Substantial evidence has been defined as evidence which has sufficient probative value to induce conviction in the minds of reasonable people. *Kentucky State Racing Comm'n v. Fuller,* 481 S.W.2d 298, 308 (Ky.1972). If there is substantial evidence

in the record to support an agency's findings, the findings will be upheld, even though there may be conflicting evidence in the record. *Kentucky Comm'n on Human Rights v. Fraser,* 625 S.W.2d 852, 856 (Ky.1981). An agency's findings are clearly erroneous if arbitrary or unsupported by substantial evidence in the record. *Id.* If the reviewing court concludes the rule of law was correctly applied to facts supported by substantial evidence, the final order of the agency must be affirmed. *Brown Hotel Co.,* 365 S.W.2d at 302.

The Commission's finding that Cecil was tardy on numerous occasions, in violation of LWC policy, *is* supported by substantial evidence. However, the Commission's conclusion that Cecil was not *terminated* for tardiness, but rather for refusing to sign the "Post Decision Making Leave Statement," is clearly erroneous. *Cecil was terminated for tardiness* as evidenced by the record. An exhibit from the January 2, 2007, and February 28, 2007, referee hearings is the October 7, 2005, letter from LWC Employee Relations Manager Cindy Kowalski informing Cecil that she was being assessed another Code of Conduct violation (her second for tardiness, and third total within 24 months), which states, in pertinent part:

> This letter further serves as the documented record of your continued attendance issues and is being forwarded to your personnel file for twenty-four (24) months. You have two Class I violations on your record from the previous 24 months. Therefore, this discipline places you at Step 3 of the Coaching and Counseling process as outlined in the Employee Code of Conduct and Performance Policy.
>
> Step 3 includes a conference and written counseling plus a one-day Paid Decision Making Leave. You are hereby suspended from work Monday, October 10, 2005 and you are instructed to return on Tuesday, October 11, 2005 promptly at 9:00 a.m. At that time you must decide either to sign a *Post–Decision Leave Statement* or to resign your employment at LWC. **Failure to sign** will be interpreted as your not committing to change this behavior and therefore, **will result in termination for repeated code violations regarding attendance.** This *Post–Decision Leave Statement* is your acknowledgement of your attendance/punctuality violations; states your desire to stay with the Company; reaffirms you [sic] Personal Quality Improvement Commitment, and acknowledges that repeated incidents of attendance violations such as tardiness, full-day absences, leaving early, etc. will result in immediate termination.

(Emphasis added.)

Cecil chose not to sign the agreement and her employment was terminated. While Cecil could have *kept her* job by signing the agreement, this is a red herring. Cecil was not discharged *for refusing to sign*—she was discharged *"for repeated code violations regarding attendance."* Accordingly, the Commission's conclusion that she was terminated *for refusing to sign the Post Decision Leave Statement* is clearly erroneous. It follows that the Commission erred, therefore, in holding that Cecil was disqualified from receiving unemployment insurance benefits *on grounds that she was discharged for refusing to obey reasonable instructions* (i.e. refusing to sign the agreement). KRS 341.370(6). Rather, Cecil was discharged for tardiness.[4]

---

4. We note that at oral argument, counsel for the Commission continued to characterize Cecil's termination as refusing to obey reasonable instructions.

■ Tardiness, however, is also disqualifying misconduct pursuant to KRS 341.370(6) ("unsatisfactory attendance if the worker cannot show good cause for absences or tardiness"). The Commission found that

> [t]he allegations that [Cecil] was repeatedly tardy to her workstation were supported by the evidence. The employer proved by a preponderance of the evidence that [Cecil] was warned several times for being chronically late, and that she was late every day but one (1) on the twelve (12) consecutive working days leading up to the date of discharge (including being ten (10) minutes or more late on seven (7) occasions within that three (3) week period).

The Commission additionally found that only one of the instances of tardiness during the aforementioned twelve working days time period (between September 21, 2005 and October 7, 2005) was for good cause. Although Cecil disputes the extent of her tardiness, we opine that there was substantial evidence in the record to support the Commission's finding that Cecil was repeatedly tardy. In light of this finding and our conclusion that Cecil was, in fact, discharged for tardiness, we hold that, pursuant to KRS 341.370(6), the Commission did not err in denying unemployment insurance benefits, albeit on different grounds.

Finally, we address Cecil's argument that in order to constitute disqualifying misconduct under KRS 341.370, there must additionally be a finding of bad faith or an inference of culpability in the form of willful or wanton conduct. Prior to 1982, KRS 341.370 simply provided that an employee would be disqualified from receiving unemployment insurance benefits if the employee was fired for "misconduct." [5] At that time, there was no statutory definition of "misconduct," and our case law (adopting the standard set forth in *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636 (1941)) held that under Kentucky's unemployment insurance act,[6] "misconduct" required a showing of "bad faith or . . . culpability in the form of willful or wanton conduct." *Shamrock Coal Co., Inc. v. Taylor, et al.*, 697 S.W.2d 952, 954 (Ky.App.1985). *See also Kentucky Unemployment Ins. Comm'n v. Duro Bag Mfg. Co.*, 250 S.W.3d 351, 354 (Ky.App.2008); *Burch v. Taylor Drug Store, Inc., et al.*, 965 S.W.2d 830, 835 (Ky.App.1998); *Douthitt v. Kentucky Unemployment Ins. Comm'n*, 676 S.W.2d 472, 474 (Ky.App.1984). However, when the General Assembly amended KRS 341.370 in 1982, adding section (6), it chose not to include that standard.

■ Unemployment insurance benefits are a statutory right granted by the General Assembly, which has the right to set the standard. "Where the words of the statute are clear and unambiguous and express the legislative intent, there is no room for construction or interpretation and the statute must be given its effect as written." *Lincoln County Fiscal Court v. Dept. of Public Advocacy*, 794 S.W.2d 162, 163 (Ky.1990). Accordingly we hold that a willful or wanton, or bad faith, finding, is not an additional requirement when the employee is discharged for conduct specifically identified in KRS 341.370(6).

---

5. At the time, KRS 341.370(1) provided, in pertinent part:
 (1) A worker shall be disqualified from receiving benefits for the duration of any period of unemployment with respect to which:
 . . .

 (b) He has been discharged for misconduct or dishonesty connected with his most recent work. . . .

6. KRS Chapter 341.

For the aforementioned reasons, we reverse the decision of the Court of Appeals and reinstate the order of the Jefferson Circuit Court which affirmed the Commission's denial of benefits.

All sitting. All concur.