RENDERED:  DECEMBER 23, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0025-MR

MARCIA EBBS, M.D.                                                APPELLANT

v.
                      APPEAL FROM OLDHAM CIRCUIT COURT
                      HONORABLE KAREN A. CONRAD, JUDGE
                      ACTION NO. 19-CI-00184

KENTUCKY UNEMPLOYMENT INSURANCE
COMMISSION AND PHYSICIANS MEDICAL
CENTER, LLC                                                      APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; DIXON AND JONES, JUDGES.

JONES, JUDGE:  The Appellant, Marcia Ebbs, M.D. ("Dr. Ebbs"), appeals the

Oldham Circuit Court's decision to affirm a decision by the Kentucky

Unemployment Insurance Commission (the "Commission") to deny Dr. Ebbs's

application for unemployment benefits following termination of her employment

by the Appellee, Physicians Medical Center ("PMC"). Having reviewed the record and being otherwise sufficiently advised, we likewise affirm.

## I.   BACKGROUND AND PROCEDURAL HISTORY

Dr. Ebbs was employed as a family practice physician at PMC from January 1, 2017, until her termination on August 17, 2018. PMC required Dr. Ebbs to treat approximately 225 patients per month. As part of this care, Dr. Ebbs was to document the treatment provided within three days of each visit via electronic medical records ("EMR"). Timely charting was essential to providing proper patient care and PMC being paid for the care provided.

When Dr. Ebbs first applied for the position at PMC, she disclosed that her typing skills were "not the best" and that her previous employer had provided her scribes to input her handwritten notes into patients' electronic charts. Dr. Ebbs alleges that she was promised a scribe when, or shortly after, she was hired. However, no one was available at PMC to work as Dr. Ebbs's scribe, and no other physicians were provided scribes at Dr. Ebbs's location, so PMC did not fulfill her request for a scribe.[1]

---

[1] Dr. Ebbs was assisted in transcribing her notes by two members of PMC's staff for a time, but the two staff members decided to return to their regular job duties rather than continue assisting Dr. Ebbs.

According to Crystal Stroud, PMC's human resources manager, Dr. Ebbs had difficulty keeping up with the pace of the medical center, resulting in charting delays and long wait times for patients.

In September 2017, Dr. Ebbs received her first non-disciplinary corrective action for failure to complete her charting for approximately 400 patients.[2] Dr. Ebbs was placed on an administrative suspension for the sole purpose of completing her charting and ultimately did so over the span of three weeks.

On June 14, 2018, Dr. Ebbs received a written warning and two-week paid suspension for again failing to complete her charting. This time, Dr. Ebbs had failed to timely complete the charts of 683 patients. PMC advised Dr. Ebbs that her suspension would continue until she was caught up with her charting. The written warning explicitly prohibited Dr. Ebbs from seeing patients, writing prescriptions, or practicing medicine during the suspension period. Upon the expiration of Dr. Ebbs's two-week suspension, Dr. Ebbs had not completed her charting and remained on suspension.

On June 29, 2018, Dr. Ebbs was again disciplined when it was discovered that she had written a prescription for a patient against the express

_____

[2] At one point in the hearing record, this event was attributed to March 2018. Dr. Ebbs actually fell behind in her charting for the first time in September 2017, and eventually caught up by January 2018. Regardless, Dr. Ebbs was again behind in her charting by March 2018.

terms of her suspension. Dr. Ebbs admitted to having written the prescription but claims to have forgotten the restrictions imposed, blaming her infraction on PMC staff not being clear on the exact terms of her suspension. At this point, Thomas Williams, PMC's new director, issued a written reminder to all of the PMC staff that Dr. Ebbs was not permitted to practice medicine or write prescriptions during her suspension.

Dr. Ebbs received her final written warning on July 13, 2018. As other providers were seeing Dr. Ebbs's patients during her suspension, it was brought to Williams's attention that, prior to her suspension, Dr. Ebbs had written a prescription for a controlled substance for a patient being treated for ADHD without an office visit to examine and monitor the patient's current physical condition.[3] Although Williams testified that office visits were required for such patients every three months, his written warning detailed Dr. Ebbs's violation as "prescribing an ADHD/ADD [medicine] without *monthly* visits; no monitoring of patient's health and well-being." Record ("R.") at 159 (emphasis added). Dr. Ebbs contends that Drug Enforcement Agency guidelines for ADHD patients only

_____

[3] The Commission's findings seem to note that the prescription written for Dr. Ebbs's ADHD patient was written during the suspension period, but a review of the record indicates differently. No information was provided to the Commission as to what prescription was written by Dr. Ebbs during her suspension. The June 29, 2018, and July 13, 2018, written warnings address two separate events.

-4-

recommend visits every three months rather than requiring them.[4]  Regardless, Dr. Ebbs was issued her final warning and was no longer permitted to treat patients under the age of eighteen.  It was also noted that Dr. Ebbs had still not completed her charting at this point.

Finally, in August 2018, one of the providers covering for Dr. Ebbs during her suspension consulted with a patient for whom Dr. Ebbs had ordered a colon cancer screening a year prior in August 2017.  The provider reported that the positive test results were in the patient's medical records but had not been communicated to the patient.  Dr. Ebbs did not recall seeing the results of the test in the patient's electronic medical records but had not asked the patient if the test had been performed as she had ordered at any of the patient's subsequent appointments.

Dr. Ebbs contends that she never received the test results from PMC staff.  According to Dr. Ebbs, it was PMC's protocol to physically deliver test results to her or her medical assistant or put the positive lab results in her designated basket.  PMC testified that its staff would directly communicate the test results to the doctor to review them with a patient and scan the test results into its

---

[4] According to Dr. Ebbs, there was a dispute between Williams and her as to whether the minor ADHD patient was malnourished.  Dr. Ebbs averred that the child was "well-developed per his chart," and that she had properly monitored the child by discussing the child's progress with the child's father when the father appeared at PMC to pick up his son's medication.

EMR system, which in turn would notify physicians of any new test results through a system of colored "jellybeans." According to Crystal Stroud, a red jellybean would appear on a patient's EMR chart any time a positive lab result was added to a patient's chart so as to notify the patient's physician. Dr. Ebbs claims to have not seen a red jellybean on this patient's EMR chart.

As a result of this incident, on August 27, 2018, Dr. Ebbs was dismissed for insubordination and unsatisfactory performance of duties. At that time, over two months after she had first been placed on suspension, Dr. Ebbs had still not completed her charting as required.

Dr. Ebbs applied for and was denied unemployment benefits by the Commission. She appealed the determination to a referee. The referee initially held two evidentiary hearings on November 1, 2018, and November 15, 2018. PMC failed to appear at the continued hearing on November 15, 2018, and a decision was rendered finding that Dr. Ebbs was discharged for reasons other than misconduct connected with her work. However, PMC appealed that decision on November 16, 2018, explaining the reasons for its failure to appear at the referee hearing. As a result, the Commission issued an order remanding and returning the claim to the referee for an additional hearing.

Following completion of the additional hearing, the Commission issued an order reversing the first referee decision holding that Dr. Ebbs was

disqualified from receiving unemployment benefits. The Commission specifically

determined that:

> [Dr. Ebbs] was discharged on August 17, 2018, for insubordination and unsatisfactory performance. The employer bears the burden of proving the alleged misconduct by a preponderance of credible evidence.
>
> KRS[5] 341.370(6) provides that "refusal to obey reasonable instructions" is misconduct. In the written warning, received June 14, 2018, [Dr. Ebbs] was instructed not to write prescriptions while on paid suspension. The instruction was reasonable during the term of her disciplinary suspension. [Dr. Ebbs's] assertions that she "forgot" the directive and filled the prescription are not credible or persuasive. She concedes that she wrote a prescription while on paid suspension in disregard of the reasonable instruction. Her acknowledged behavior constitutes statutory misconduct under the cited example.
>
> As unsatisfactory performance is not conduct covered by any statutory example, it is adjudicated under the standard stated in [*Douthitt v. Kentucky Unemployment Ins. Comm'n*, 676 S.W.2d 472, 474 (Ky. App. 1984)] which encompasses the broad standard of general duties a worker owes to her employer. Under the common law, misconduct is worker behavior that shows a willful or wanton disregard of an employer's interest; such is shown by a deliberate disregard of the standard of behavior an employer has the right to expect or of duties owed to an employer.
>
> An employer is obligated to render loyal, diligent, faithful, and obedient service and failure to do so is a disregard of the standards of behavior that an employer has the right to expect. *Brown Hotel Co. v. White*, 365

---

[5] Kentucky Revised Statutes.

-7-

S.W.2d 306, 307 (Ky. 1962). A worker's repeated refusal to perform known duties as ordered over a lengthy period of time satisfies the common law test for misconduct. *Runner v. Commonwealth*, 323 S.W.3d 7, 11 (Ky. App. 2010). Some expected standards of behavior are so implicit in the employment relationship that their breach is an obvious act in willful or wanton disregard of the employer's interest.

The employer failed to prove that [Dr. Ebbs] was aware but failed to advise a patient of positive colon cancer-screening results. The reporting provider did not appear or provide testimony; admitted documentation does not reflect the date on which the test results were included in the patient's medical records. Thus, misconduct is not found based on this allegation. However, [Dr. Ebbs's] failure to ask the patient if the test had been conducted as ordered and reflected in the patient's medical records on the dates of two subsequent visits shows a disregard for the standard of care the patient and the employer had a right to expect.

Despite an asserted lack of typing skills and need for a scribe, nothing in the record indicates that [Dr. Ebbs] was unable to timely perform electronic charting duties prior to March 2018. The non-disciplinary action imposed at that time placed [Dr. Ebbs] on notice that the employer expected timely completion of charting duties going forward. Falling 683 charts behind (or 2.5 months of visits/consultations) between March and June 2018 demonstrates a refusal to perform known duties as ordered and expected, a willful and wanton disregard for the health of patients and potential liability of the employer, and a disregard of the standard of behavior the employer had a right to expect from the physician.

Failure to complete the delinquent charting during the two months of paid suspension indicates a disregard of the duties owed the employer. Further, prescribing a controlled substance to an 8-year-old emaciated patient

without allowing examination or monitoring of the patient's physical condition demonstrates a disregard of the standard of care the patient and the employer had a right to expect.

The employer has met its burden of proof, as required by *Brown Hotel*. Therefore, it is held that [Dr. Ebbs] was discharged for misconduct connected to the work and is disqualified from August 12, 2018 through the duration of the unemployment period.

R. at 338-39.

Dr. Ebbs timely appealed to Oldham Circuit Court, asserting that the Commission's findings of facts were not supported by substantial evidence of probative value. On December 19, 2019, the Oldham Circuit Court affirmed the Commission's findings:

1. Plaintiff's failure to ask the patient if his colon cancer test had been conducted as ordered and reflected in the patient's medical records on the dates of two subsequent visits showed a disregard for the standard of care the patient and employer had a right to expect.

2. While on notice from employer, falling 683 charts behind between March and June 2018 demonstrates a refusal to perform known duties as ordered and expected, a willful and wanton disregard for the health of patients and potential liability of the employer, and a disregard of the standard of behavior the employer has a right to expect from a physician.

3. Failure to complete the delinquent charting during the two months of paid suspension indicates a disregard of duties owed to the employer.

4. Prescribing a controlled substance to a patient without an office visit allowing examination or monitoring of the patient's physical condition demonstrates a disregard of the standard of care the patient and employer had a right to expect.

. . .

Substantial evidence in the record supports the finding that [Dr. Ebbs's] termination was for misconduct in connection with her work. She was aware of her responsibilities, was capable of performing her duties, and had been warned of the consequences of her actions. This Court believes her actions and behavior did not represent mere efficiency or unsatisfactory conduct, but rather a refusal to perform her work as ordered. Such clearly satisfies the common-law test for misconduct. "Where an employee manifests an intent to disobey the reasonable instructions of his employer, the denial of unemployment compensation benefits on the basis of misconduct is proper." *City of Lancaster v. Trumbo*, [660 S.W.2d 954, 956 (Ky. App. 1983)].

The rule in Kentucky is that if there is substantial evidence in the record to support an agency's findings, the findings will be upheld, even though there may be conflicting evidence in the record. *Kentucky Comm'n on Human Rights v. Fraser*, 625 S.W.2d 852, 856 (Ky. 1981) (citing *Taylor v. Coblin*, 461 S.W.2d 78 (Ky. 1970); *Reeves v. Jefferson County*, 245 S.W.2d 606 (Ky. 1951)). The agency's findings are clearly erroneous only if deemed arbitrary or unsupported by substantial evidence in the record. *Id.* In the present case, the Commission cited to four instances of misconduct connected to work in denying [Dr. Ebbs] her unemployment benefits. [Dr. Ebbs] had not shown that the findings of the Commission were erroneous or unsupported by substantial evidence.

R. at 505, 507.

-10-

This appeal followed.

## II.   STANDARD OF REVIEW

An appellate court's review of an administrative agency's decision is somewhat limited. *Thompson v. Kentucky Unemployment Ins. Comm'n*, 85 S.W.3d 621, 624 (Ky. App. 2002).

> The judicial standard of review of an unemployment benefit decision is whether the [Commission's] findings of fact were supported by substantial evidence and whether the agency correctly applied the law to the facts. Substantial evidence is defined as evidence, taken alone or in light of all the evidence, that has sufficient probative value to induce conviction in the minds of reasonable people. If there is substantial evidence to support the agency's findings, a court must defer to that finding even though there is evidence to the contrary. A court may not substitute its opinion as to the credibility of the witnesses, the weight given the evidence, or the inferences to be drawn from the evidence. A court's function in administrative matters is one of review, not reinterpretation.

*Id.* (footnotes omitted).

While the Court must defer to findings of fact, it reviews issues of law *de novo*. *Wilson v. Kentucky Unemployment Ins. Comm'n*, 270 S.W.3d 915, 917 (Ky. App. 2008).

## III.   ANALYSIS

Dr. Ebbs alleges several errors on appeal: (1) that the Commission erred by substituting its judgment for that of the employer with regard to

-11-

determining instances of misconduct resulting in termination; (2) that the Commission erred in determining that Dr. Ebbs refused to obey reasonable instructions when she wrote a prescription while suspended; (3) that the Commission erroneously concluded that Dr. Ebbs's repeated incomplete charting amounted to willful and wanton disregard of her employer's interests as required by common law misconduct under *Douthitt*;[6] and (4) that the Commission incorrectly determined that Dr. Ebbs's failure to ask her patient about his colon cancer screening amounted to common law misconduct. For the following reasons, we affirm the circuit court's judgment.

Dr. Ebbs argues that the Commission may not substitute its judgment for that of the employer with regard to determining instances of misconduct.[7] However, our Court has already determined that the Commission is at liberty to

---

[6] 676 S.W.2d 472 (Ky. 1984).

[7] According to Dr. Ebbs, the Commission is required to narrowly interpret an employer's stated reason for firing an employee under *Kentucky Unemployment Insurance Commission v. Jones*, 809 S.W.2d 715, 716 (Ky. App. 1991). In that case, an employer sought to deny unemployment benefits to employees it placed on an unpaid "suspension for misconduct." The Court held that, under the rules of strict construction, even if the employees had committed misconduct for which they had been suspended, they were still entitled to unemployment benefits because they had not been told they were "discharged" for misconduct. Under strict construction, a "suspension" was not a "separation from employment" as defined in KRS 341.370(6) because, during a suspension, employment with the employer still continues. *Jones*, 809 S.W.2d at 716-17. Dr. Ebbs argues that, according to *Jones*, the rules of strict construction require the Commission to "heed as completely dispositive an employer's characterization of its reasons for firing an employee." Appellant's Br. at 15. Clearly, this is incorrect. The *Jones* holding does not pertain to situations in which employers give out a series of warnings escalating to termination but rather to statutory definitions.

deny unemployment benefits for reasons other than those offered by an employer for termination. In *Alford v. Kentucky Unemployment Insurance Commission*, a case uncited by either party, Appellant Alford argued that the Commission "was not authorized to base his disqualification from receiving benefits on a different reason than that offered by [his employer]." 568 S.W.3d 367, 370 (Ky. App. 2018). However, our Court held:

> The Commission has broad authority to re-weigh the evidence and to make a final determination based on that evidence. *Burch v. Taylor Drug Store, Inc.*, 965 S.W.2d 830, 834 (Ky. App. 1998), *abrogated on other grounds by [Kentucky Unemployment Ins. Comm'n v. Cecil*, 381 S.W.3d 238 (Ky. 2012)]. *See also* KRS 341.430(1). We conclude that the Referee and the Commission were entitled to base their findings of disqualification on [the employee's] conduct, rather than merely the specific rules cited by the [employer] as a basis for his termination.

*Id*.

Nothing binds the Commission to accepting the employer's ultimate reason for the employee's termination. Instead, the award or denial of unemployment compensation benefits lies solely in the statutorily mandated province of the Commission.

In the present case, Dr. Ebbs was given a series of warnings leading up to her termination, including a final warning. Dr. Ebbs's final indiscretion was merely one instance in a pattern of infractions posing a risk of harm to both her

patients and her employer. As noted by the circuit court, the Commission identified within that pattern one instance of Dr. Ebbs's refusal to follow reasonable instructions as per KRS 341.370(6) and four instances of misconduct evincing willful or wanton disregard of an employer's interests.

KRS 341.370(1)(b) provides that a "worker shall be disqualified from receiving benefits for the duration of any period of unemployment with respect to which . . . [h]e has been discharged for misconduct or dishonesty[.]" Although the statute does not specifically define "discharge for misconduct," KRS 341.370(6) delineates the term as including, but not being limited, to:

> [S]eparation initiated by an employer for falsification of an employment application to obtain employment through subterfuge; knowing violation of a reasonable and uniformly enforced rule of an employer; unsatisfactory attendance if the worker cannot show good cause for absences or tardiness; damaging the employer's property through gross negligence; *refusing to obey reasonable instructions*; reporting to work under the influence of alcohol or drugs or consuming alcohol or drugs on employer's premises during working hours; conduct endangering safety of self or co-workers; and incarceration in jail following conviction of a misdemeanor or felony by a court of competent jurisdiction, which results in missing at least five (5) days work.

KRS 341.370(6) (emphasis added).

When a type of conduct does not fall within one of the listed examples, it is analyzed under the old common law definition of "misconduct" as

-14-

established by *Boynton Cab Company v. Neubeck*, 237 Wis. 249, 296 N.W. 636

(1941), and adopted in Kentucky by *Douthitt v. Kentucky Unemployment*

*Insurance Commission*, 676 S.W.2d 472 (Ky. 1984). The *Boynton Cab* Court held:

> [T]he term "misconduct" . . . is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed "misconduct" within the meaning of the statute.

*Boynton Cab*, 296 N.W. at 640.

Dr. Ebbs first asserts that the Commission's conclusion that Dr.

Ebbs's writing a prescription while on paid suspension evidenced a "refusal to

obey reasonable instructions" under KRS 341.370(6) is unsupported by evidence.

Dr. Ebbs argues that she forgot about the terms of her suspension rather than

refusing or rejecting them. Because the legislature has specifically provided that

"discharge for misconduct" includes "refusing to obey reasonable instructions," the

additional common law requirement of "wilful or wanton conduct" does not apply

to determine whether the discharge was for statutory "misconduct." Instead, "a

-15-

'refusal' may arise from one's actual verbal rejection or, more typically, by one's careless or unreasonable disregard or ignoring of an employer's reasonable instructions." *Holbrook v. Kentucky Unemployment Ins. Comm'n*, 290 S.W.3d 81, 87 (Ky. App. 2009).

In the June 14, 2018, written warning, Dr. Ebbs was instructed not to practice medicine or write prescriptions while on suspension. Dr. Ebbs admitted that, despite those instructions, she wrote a prescription while suspended. The Commission found Dr. Ebbs's assertions that she "forgot" the directive unpersuasive and lacking credibility. As factfinder, the Commission is entitled to determine the credibility of the witnesses, and we defer to its findings. *Thompson*, 85 S.W.3d at 624. We may not substitute our "opinion as to the credibility of the witnesses, the weight given the evidence, or the inferences to be drawn from the evidence." *Id*. Furthermore, even forgetting a specific term of one's suspension evinces careless disregard of PMC's reasonable terms for Dr. Ebbs's administrative suspension.

Dr. Ebbs also argues that the Commission erred in its determination that Dr. Ebbs's falling behind 683 charts and failure to complete that charting during her suspension was misconduct. Dr. Ebbs maintains that the evidence before the Commission demonstrates inability rather than refusal with regard to completing her charting as required. Dr. Ebbs alleges that because she was at

-16-

some points provided assistance from PMC staff in transcribing her notes, the evidence shows an incapability rather than a refusal to perform her work as ordered.

Again, the Commission, as finder of fact, was free to draw its own inferences from the evidence before it so long as there was substantial evidence to support its findings. *Thompson,* 85 S.W.3d at 624. It is not our role, nor is it the circuit court's, to superimpose our own reinterpretation of the facts contrary to the Commission's. *Id.* In this case, the Commission found that Dr. Ebbs was not incapable of completing her charting, having previously completed the charting for 400 delinquent charts in a span of two weeks. The Commission concluded that Dr. Ebbs knowingly fell hundreds of charts behind for a second time and failed to complete the delinquent charting during the two months she was given to do so. Like the circuit court, we hold this finding to be supported by substantial evidence in the record.

Dr. Ebbs correctly points out, however, that the Commission and the circuit court at times erred in referring to the standard of conduct owed to PMC as mere "disregard of the standard of behavior an employer has a right to expect." As previously noted, the standard under *Douthitt* and *Boynton Cab* is "such *wilful or wanton* disregard of an employer's interests[,] . . . disregard of standards of behavior which the employer has the right to expect of his employee," or "an

-17-

intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer." *Boynton Cab*, 296 N.W. at 640 (emphasis added).

> Without question, "[t]he underlying principle of the statutory scheme for unemployment compensation evinces a humanitarian spirit and it should be so construed." *Alliant Health System v. Kentucky Unemployment Insurance Commission*, 912 S.W.2d 452, 454 (Ky. App. 1995). However, as noted by a panel of this Court in *Shamrock Coal Company, Inc. v. Taylor*, 697 S.W.2d 952, 954 (Ky. App. 1985), "an employer is entitled to the faithful and obedient service of his employee, and that failure to render same may constitute misconduct by the employee." *See also Brown Hotel v. White*, 365 S.W.2d 306 (Ky. 1963).

*Runner v. Commonwealth*, 323 S.W.3d 7, 11 (Ky. App. 2010), *as modified* (Sept. 24, 2010).

While mere disregard does not amount to the level of willfulness or wantonness required, Kentucky case law provides that a worker's repeated "refusal to perform [known duties] as ordered over a lengthy period of time . . . satisfies the common-law test for misconduct." *Id.*; *see also Masonic Homes of Kentucky, Inc. v. Kentucky Unemployment Ins. Comm'n*, 382 S.W.3d 884, 885 (Ky. App. 2012) (holding that an employee's repeated misbehavior despite her employer's explicit warnings would have evidenced misconduct had there not been sufficient evidence of a mitigating psychological condition). In *Runner*, Runner was issued a series of written reprimands prior to her dismissal. Runner received her first reprimand for

"disruptive and insubordinate e-mails" and her second for "failing to perform assigned work"; she was then suspended for "disregarding a directive repeatedly issued by her supervisor" and "unsatisfactory performance of duties." *Id*. at 9. Our Court determined:

> Substantial evidence in the record supports the finding that Runner's termination was for misconduct in connection with her work. She was aware of her responsibilities, was capable of performing her duties, and had been warned of the consequences of her actions. Contrary to Runner's assertions, we are of the opinion that her actions and behavior did not represent mere inefficiency or unsatisfactory conduct, but rather a refusal to perform her work as ordered over a lengthy period of time. Such clearly satisfies the common-law test for misconduct.

*Id*. at 11.

Similarly, Dr. Ebbs repeatedly disregarded PMC's explicit instructions with regard to charting. She has not provided any affirmative evidence of her inability to perform her charting duties other than her own self-serving testimony, which the Commission found lacked credibility. Instead, Dr. Ebbs repeatedly fell grossly behind in her duties despite knowing that staying up to date on her charting was necessary for her patients' well-being and for her employer. These repeated failures in light of PMC's warnings and suspensions evidence Dr. Ebbs's intentional and substantial disregard of PMC's interests and of her duties and obligations to PMC under *Runner* and *Boynton Cab*.

-19-

Dr. Ebbs also maintains that her failure to ask her patient about his colon screening test was not misconduct amounting to willful or wanton disregard of PMC's interests or the standards of behavior PMC had the right to expect from her under *Douthitt*. According to Dr. Ebbs, this failure was an act of ordinary negligence and therefore not misconduct.

As noted by the Commission, "[s]ome expected standards of behavior are so implicit in the employment relationship that their breach is an obvious act in willful or wanton disregard of the employer's interest." R. at 339. It is implicit in Dr. Ebbs's employment as a physician that her duty of care to her patients is paramount. PMC had a right to expect that Dr. Ebbs would adhere to the standard of care owed to her patients as a medical professional. Although Dr. Ebbs did not directly receive the cancer screening test results, she failed to ask her patient about whether the test had been performed at two subsequent visits over the next year. The situation was only rectified after another provider saw the test results in the patient's electronic charting during Dr. Ebbs's suspension. As a result of her failure, Dr. Ebbs's patient was not alerted to his positive colon cancer screening until almost a year after the test was first requested, delaying cancer treatment.

Not only did Dr. Ebbs's inaction endanger her patient's well-being, it opened PMC up to potential and considerable liability. Dr. Ebbs acted with substantial disregard for PMC's interests and the standards of behavior which PMC

had the right to expect from its employees. The Commission correctly determined that this incident, particularly in combination with Dr. Ebbs's other recent infractions, amounted to common law misconduct.

"A reviewing court is not free to substitute its judgment for that of an agency on a factual issue unless the agency's decision is arbitrary and capricious." *McManus v. Kentucky Retirement Systems*, 124 S.W.3d 454, 458 (Ky. App. 2003) (citing *Johnson v. Galen Health Care, Inc.*, 39 S.W.3d 828, 832 (Ky. App. 2001)). Accordingly, we hold that the Commission did not misapply the law when it found that Ebbs had been discharged for misconduct and, consequently, the circuit court properly affirmed the Commission's decision.

## IV. CONCLUSION

In light of the foregoing, we AFFIRM the December 19, 2019, Order of the Oldham Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Philip C. Kimball
Louisville, Kentucky

BRIEF FOR APPELLEE
KENTUCKY UNEMPLOYMENT
INSURANCE COMMISSION:

Linda Keeton
Frankfort, Kentucky